659 F.2d 574
 27 Fair Empl.Prac.Cas. 41, 27 Empl. Prac.
Dec. P 32,180
John H. DICKERSON, Plaintiff-Appellant,
v.
METROPOLITAN DADE COUNTY, a political subdivision of the
State of Florida, d/b/a The Department of Environmental
Resources Management f/k/a Dade County Pollution Control;
Paul Leach; Colen Morrison[1], former directors of
Dade County Pollution Control and Edward Gancher, formerly
Chief Chemist; Dade County Pollution Control, Defendants-Appellees.
 No. 80-5662
 
 Summary Calendar.
 United States Court of Appeals,
Fifth Circuit.
 Unit B*
 Oct. 19, 1981.
 Long & Smith, Harold Long, Jr., Miami, Fla., for plaintiff-appellant.
 Susan E. Trench, Asst. County Atty., Miami, Fla., for Metropolitan Dade County.
 Appeal from the United States District Court for the Southern District of Florida.
 Before HILL, VANCE and HATCHETT, Circuit Judges.
 VANCE, Circuit Judge:
 
 
 1
 The plaintiff, a black person formerly employed as a chemist by the Dade County Department of Environmental Resources Management (DERM), brought suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., alleging two instances of discriminatory employment practices.[2] Dickerson first alleged that DERM failed to promote him from his position as Chemist II to that of Chief Chemist because of his race. He next alleged that he was subsequently discharged in retaliation for filing a complaint with the Equal Employment Opportunities Commission (EEOC) alleging discriminatory denial of promotion. After the plaintiff filed a complaint with the EEOC and conciliation efforts failed, he received the statutory right to sue letter and suit was timely filed. Following trial the district court held that Dickerson failed to develop a prima facie case of discrimination under either count and entered judgment for defendants.
 
 
 2
 On appeal Dickerson urges two grounds for reversal. First, he argues that the trial court erred in refusing to allow an EEOC investigator to testify to his reasons for finding probable cause to believe that Dickerson had been denied promotion because of his race. He next argues that there was insufficient evidence to support the lower court's finding that his discharge was not in retaliation for filing the EEOC complaint. We affirm.
 
 I.
 
 3
 Dickerson graduated from Bethune Cookman College in 1962, where he maintained a "C" average while majoring in chemistry and mathematics. He did not hold a job in chemistry, however, until DERM hired him as a laboratory technician on November 25, 1968. Fairly soon thereafter plaintiff applied for a Chemist II position in the department. He did not receive the position at the time, but in July 1969 the department created a Chemist I position for him and froze the Chemist II position until he had gained sufficient experience to qualify for the Chemist II position. On November 23, 1970 he was promoted to the previously frozen Chemist II position and his Chemist I position was abolished. The plaintiff remained in the Chemist II position until he was discharged from DERM on December 10, 1976.
 
 
 4
 Between November 1970 and April 1972, DERM's Chief Chemist twice evaluated the plaintiff's job performance. In each case the plaintiff received a merit wage increase, but the evaluation rated him weak in personal relations with supervisors and stated that he needed attention in his relations with his fellow employees. Plaintiff did not appeal either rating.
 
 
 5
 In April 1972 the Chief Chemist was dismissed and replaced by Wynthrop Nystrom, a male caucasian who previously had been employed by DERM as a pollution control inspector but had no experience in the laboratory division which he was to supervise. Although Nystrom did not have a graduate degree in chemistry he had graduated magna cum laude from the University of Miami, had been a Rhodes Scholar, and had begun graduate training in chemistry at the University of Leicester, England. The Chief Chemist job had not been advertised prior to Nystrom's selection. Testimony indicated, however, that Dickerson had been considered for the position but had not received it partly because his past performance evaluations indicated that he did not have the interpersonal skills necessary to supervise the laboratory.[3] On May 12, 1972 plaintiff filed a complaint with the EEOC alleging that DERM had discriminated against him on the basis of race by selecting Nystrom as Chief Chemist.
 
 
 6
 In September 1972 the defendant Colin Morrissey became Director of DERM. At that time he spoke to the plaintiff concerning the possibility of promoting plaintiff to the Chief Chemist position in the future. He told the plaintiff that before he could be considered for the position he would have to begin graduate level course work in chemistry. Despite this discussion with Morrissey plaintiff never undertook any graduate training. During the next year, however, plaintiff received job evaluations which rated his work and his staff relation skills as satisfactory.
 
 
 7
 Over the next three years DERM twice passed over Dickerson when it had to replace the resigning Chief Chemist. In April 1973 it selected David R. Barker for the position and in April 1975 it appointed Edward Gancher. Both persons had superior academic qualifications and greater experience than plaintiff.[4] Testimony nonetheless indicated that the plaintiff had been considered for the position each time it opened, but had not been selected at least partially because he had failed to begin graduate training.[5] The job had remained unfilled for six months before Gancher was hired. During that period plaintiff shared the responsibilities of Chief Chemist with another DERM employee. Testimony indicated, however, that plaintiff had been unable during this period to complete adequately the task of budget justification, normally one of the Chief Chemist's major duties.
 
 
 8
 On April 22, 1975 the EEOC determined that there was probable cause to believe that DERM had discriminated against plaintiff by hiring Nystrom as Chief Chemist. The EEOC, however, did not compile any statistical data to indicate a pattern or practice of discriminatory promotional practices within DERM, nor did it interview the person responsible for hiring Nystrom.[6]
 
 
 9
 Two months after he began work at DERM, defendant Gancher evaluated plaintiff's job performance. He rated the plaintiff as needing attention in personal relations with fellow employees and weak in his relations with his supervisors, but otherwise satisfactory. Dickerson appealed this determination and an appeals panel overturned the rating because Gancher had not judged plaintiff's work for the entire year. The panel recommended that the two discuss the problems and try to resolve the alleged shortcomings that Gancher had perceived. Gancher and the plaintiff met during the summer of 1975 to discuss their differences but the plaintiff walked out of the meeting when Gancher began to outline specific objections.
 
 
 10
 Dickerson injured his back on September 23, 1975 and was awarded a four months disability leave by Metropolitan Dade County. In a letter dated December 3, 1975 his doctor, Dr. Walter Jones, informed defendants that Dickerson was able to return to work. He did not return to work, however, until after he had been informed that his disability leave had been terminated and that any absence after February 1 would be charged against his accrued sick leave. Even after this letter, plaintiff remained absent for most of February. On February 25, 1976 DERM's administrative officer wrote to plaintiff's doctor to request medical confirmation that plaintiff was unable to return to work. Dr. Jones responded in a letter dated February 26, 1976 that he had advised him to return to work and had thought that he had done so. In a subsequent letter dated March 12, Dr. Jones stated his belief that the plaintiff was exaggerating his symptoms and that he should be able to return to work.[7]
 
 
 11
 After his return to work plaintiff's attendance was sporadic. Between February 1 and June 16, he was absent approximately forty-two days. In August he took a vacation of approximately three weeks. While on vacation plaintiff reinjured his back. Consequently he failed to report to work between August 23, 1976 and September 20, 1976.
 
 
 12
 Plaintiff's job evaluation covering the six months ending September 30, 1975 rated his performance as satisfactory, except that it again indicated that he needed attention in his personal relations with his staff and his supervisors. His next performance evaluation, covering the period to April 8, 1976, rated plaintiff's performance as unsatisfactory in three areas: (1) quantity of work produced; (2) work habits; and (3) personal relationships with the staff. He was rated as needing attention in quality of work and in his supervisory abilities. The primary basis for this rating was excessive absenteeism and a generally hostile attitude which affected his ability to perform the job satisfactorily. Plaintiff appealed both evaluations. The performance appeals panel affirmed the evaluation covering the period through September 30, 1975 and affirmed in part the evaluation covering the period to April 8, 1976. The panel recommended that the latter evaluation be upheld as to his personal relations and his work habits, but it recommended that the other three evaluations be modified.[8]
 
 
 13
 After Dickerson returned to work on September 20, 1976 he was assigned two jobs to perform on his own. He was to set up an air monitoring system and to requisition a new mobile air van and operate it when it arrived. He was also to conduct certain air monitoring tests pursuant to detailed written instructions and to order any chemicals necessary for those tests. Plaintiff failed to perform either of the assignments.[9]
 
 
 14
 On December 2, 1976 a disciplinary action report was filed charging plaintiff with excess absenteeism, inability to get along with fellow employees or supervisors, and incompetent work. Plaintiff responded to the report in writing but was discharged effective December 10, 1976. Plaintiff appealed the decision. The examiner recommended that Dickerson's discharge for excess absenteeism and for inability to get along with fellow employees be sustained, but recommended that the charge of incompetent job performance be overturned. The Dade County manager affirmed this decision. Thereafter, plaintiff filed a third charge with the EEOC alleging retaliatory firing.
 
 II.
 
 15
 Plaintiff's first contention on appeal presents an unusual twist to an old question. At trial, the district judge admitted into evidence the "sanitized" EEOC file[10] of the investigation of plaintiff's complaint which led to a finding that there was probable cause to believe that Dickerson was not promoted because of his race. The district judge also allowed the EEOC investigator to testify about the facts underlying his findings. Dickerson contends that the judge's refusal to go further and allow testimony about the investigator's evaluation of the facts and his related legal analysis[11] constituted prejudicial error. Essentially, Dickerson seeks to expand this circuit's rule that an EEOC investigative file should be admitted into evidence into a rule that requires the admission into evidence of all testimony relating to an EEOC investigation. This we decline to do.
 
 
 16
 Plaintiff's principal reliance upon our decision in Smith v. Universal Services, Inc., 454 F.2d 154 (5th Cir. 1972), is misplaced. There we held that the district court was obligated to admit into evidence the EEOC investigative report and findings because their probative value outweighed any possible prejudice to the employer. See also Garcia v. Gloor, 618 F.2d 264, 272 (5th Cir. 1980), cert. denied, 449 U.S. 1113 101 S.Ct. 923, 66 L.Ed.2d 842 (1981); Peters v. Jefferson Chemical Co., 516 F.2d 447, 450 (5th Cir. 1975). Once the investigative report and findings have been admitted into evidence, however, the incremental probative value of additional testimony by the EEOC investigator is likely to be slight. Indeed, mandating the admission of testimony that will often be cumulative and prejudicial is a danger that militates against any expansion of the Smith rule. Cf. Fed.R.Evid. 403; Johnson v. William C. Ellis & Sons Iron Works, Inc., 604 F.2d 950, 958 (5th Cir. 1979), modified, 609 F.2d 820 (5th Cir. 1980) (cumulative and prejudicial evidence properly excluded). Consequently, we believe that once the narrow command of Smith is met the normal rules governing expert testimony should apply and any decision whether to admit further evidence by the EEOC investigator should be committed to the sound discretion of the trial judge. Dyas v. Kansas City Southern Railway, 425 F.2d 1073, 1074 (5th Cir. 1970). Only if we find that the trial court's ruling was "manifestly erroneous" may we find that he abused this discretion. Stancill v. McKenzie Tank Lines, Inc., 497 F.2d 529, 535 (5th Cir. 1974), citing Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962).
 
 
 17
 We hold that the trial court's decision to exclude testimony by the EEOC investigator as to his evaluation of facts already in evidence was not an abuse of discretion. The trial judge correctly recognized that in Title VII litigation, the district court reviews the evidence de novo, independent of any determination by the EEOC.[12] Consequently, it is the trial judge who must find the facts and draw legal conclusions from them. Hilton v. Wyman-Gordon Co., 624 F.2d 379, 382-83 (1st Cir. 1980). Cf. Smith v. Universal Services, Inc., 454 F.2d at 160 (Dyer, J., dissenting from denial of petition for rehearing en banc) (determining credibility of witnesses is sole function of fact finder).[13] The trial court determined in this case that further testimony by the EEOC investigator would not aid it in the evaluation of the facts in evidence.[14] We find no reason to disturb the trial court's discretionary ruling with respect to the EEOC investigator's testimony.[15]III.
 
 
 18
 Plaintiff next contends that the evidence does not support the finding that he was not fired in retaliation for filing EEOC charges.[16] Section 704(a) of Title VII governs claims of retaliatory treatment and offers broad protection to those who seek to vindicate their civil rights through the Title VII machinery.[17] Pettway v. American Cast Iron Pipe Co., 411 F.2d 998, 1005 (5th Cir. 1969). Nonetheless, not every employee who is fired after having filed charges with the EEOC will fall within the protective ambit of section 704(a). In this case, we believe that the trial court correctly concluded DERM did not fire Dickerson in retaliation for filing his EEOC complaint.[18]
 
 
 19
 To establish a violation of section 704(a), the plaintiff must meet the requirements of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See Gupta v. East Texas State University, 654 F.2d 411, 414 (5th Cir. 1981); Whatley v. Metropolitan Atlanta Rapid Transit Authority, 632 F.2d 1325, 1327-28 (5th Cir. 1980). First, the complainant in a Title VII action bears the initial burden of establishing a prima facie case of retaliatory conduct. McDonnell Douglas Corp. v. Green, 411 U.S. at 802, 93 S.Ct. at 1824. The burden of production then shifts to the employer to articulate some legitimate nondiscriminatory reason for terminating the employee. Id. See also Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 1094-95, 67 L.Ed.2d 207 (1981). Finally, the burden again shifts and the plaintiff must be afforded the opportunity to demonstrate that the alleged nondiscriminatory basis for firing was merely a pretext for discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. at 804, 93 S.Ct. at 1825; Corley v. Jackson Police Department, 566 F.2d 994, 998 (5th Cir. 1978).
 
 
 20
 The trial court concluded that Dickerson failed to meet his initial burden of establishing a prima facie case of retaliatory termination. To prove a prima facie case under section 704(a) the Title VII plaintiff must establish by a preponderance of the evidence (1) that he engaged in an activity protected by Title VII; (2) that an adverse employment action occurred; and (3) that there was a causal connection between the participation in protected activity and the adverse employment action. Smalley v. City of Eatonville, 640 F.2d 765, 769 (5th Cir. 1981); Whatley v. Metropolitan Atlanta Rapid Transit Authority, 632 F.2d at 1328. Although we are bound by the trial court's subsidiary findings of fact unless they are clearly erroneous, we, as an appellate court, must independently review the merits of Dickerson's allegation of retaliatory termination. Gupta v. East Texas State University, 654 F.2d at 414; East v. Romine, Inc., 518 F.2d 332, 339 (5th Cir. 1975).
 
 
 21
 There is no dispute that Dickerson established the first two elements of a prima facie case of retaliatory firing. He filed a complaint with the EEOC in 1972, amending it in 1976 and 1977, and he was discharged from employment. After a thorough examination of the record, however, we are convinced that the plaintiff failed to establish the requisite causal link between the complaints and his discharge. Dickerson adduced no evidence to suggest a causal connection except for proof of a disharmonious relationship with Gancher and the fact of discharge four and one-half years after he filed his original complaint with the EEOC. Rather, the evidence demonstrated that DERM fired Dickerson because of excess absenteeism, poor work relations with the laboratory staff, and inadequate work.
 
 
 22
 DERM established, and plaintiff did not controvert, the large amount of time plaintiff was away from work because of his back injury. DERM also proved that the extended absences placed an intolerable burden on the rest of the laboratory. Finally, DERM proved that it reasonably believed that Dickerson's absences were not justified by his claims of a back injury and that it partially acted in that belief when it fired him. It had received several letters from plaintiff's doctor to the effect that he believed plaintiff was exaggerating his symptoms and should have returned to work. That subsequent events showed this doctor may have been wrong in that plaintiff required back surgery does not change the story.[19] Even if DERM were wrong in its evaluation of the seriousness of the injury and the justifiability of the absences, it did not violate Title VII if it acted on a reasonable belief about the absences. Jefferies v. Harris County Community Action Association, 615 F.2d 1025, 1036 (5th Cir. 1980). As long as DERM applied its disciplinary rules for excess absenteeism without discrimination, we will not evaluate the merits of those disciplinary rules. Id. See also McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273, 283, 96 S.Ct. 2574, 2580, 49 L.Ed.2d 493 (1976). Here, the evidence demonstrated that DERM had discharged white employees for excess absenteeism prior to its discharge of Dickerson. We believe DERM established that it has applied its disciplinary rules impartially. Compare Jenkins v. Caddo-Bossier Association for Retarded Children, 570 F.2d 1227 (5th Cir. 1978) (per curiam) with Brown v. A.J. Gerrard Manufacturing Co., 643 F.2d 273 (5th Cir. 1981). The evidence also supports the trial court's determination that plaintiff lost his job partially because of a poor working relationship with the laboratory staff and his supervisors, as well as inadequate work product between September 20, 1976 and his discharge in December.[20]
 
 
 23
 The trial court correctly held that plaintiff failed to prove that DERM fired him in retaliation for filing a complaint with the EEOC. Its decision is therefore affirmed.
 
 
 24
 AFFIRMED.
 
 
 
 [1]
 The complaint incorrectly spelled the name of this defendant. The correct spelling is Colin Morrissey
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452 October 14, 1980
 
 
 [2]
 He also asserted that both instances of discrimination violated his rights under 42 U.S.C. §§ 1981, 1983, 1985(3) and 1988. The district court dismissed as time barred that part of Count I brought pursuant to 42 U.S.C. § 1981 et seq. Dickerson v. Metropolitan Dade County, No. 78-2002-Civ.-CA (S.D.Fla.Dec. 10, 1979) (I R. 141). The plaintiff does not appeal this decision
 
 
 [3]
 Plaintiff did not apply for the Chief Chemist position at any time. He testified, however, that DERM knew of his interest in the position
 
 
 [4]
 David R. Barker had a bachelors degree in applied chemistry and a doctorate in analytical chemistry as applied to environmental problems. He had twelve years work experience and had published several articles about his pollution research
 Edward Gancher held a bachelors degree and a masters degree in analytical chemistry. He had more than ten years experience in industrial research related to air and water pollution and had published several articles in the field.
 
 
 [5]
 Also, upon leaving Dr. Barker recommended that the position be filled from outside the division because he did not believe that anyone, including plaintiff, was qualified to assume the job. It does not appear that lack of interpersonal skills was a cause for which plaintiff was not promoted. He had received satisfactory ratings on this score from both Mr. Nystrom and Dr. Barker
 
 
 [6]
 The EEOC investigator only interviewed a personnel officer at DERM. That employee had no responsibility for selecting the Chief Chemist. III R. (I Tr.) 61
 
 
 [7]
 In April 1976 plaintiff amended his EEOC complaint to allege harassment in retaliation for filing the 1972 complaint
 
 
 [8]
 The panel recommended that the rating be changed to "needs attention" for quantity of work and "satisfactory" for quality of work. It also recommended that no rating be given for supervisory skills in light of the fact that Mr. Dickerson's frequent absences had led Mr. Gancher to remove any laboratory personnel from under his supervision. The panel also suggested that Mr. Gancher and Mr. Dickerson try to mediate their differences. Mr. Dickerson again agreed to undertake graduate training in chemistry and interpersonal skills. He attended a transactional analysis seminar but nothing more
 
 
 [9]
 On December 7, 1976 Mr. Gancher transferred the air monitoring test assignment to another chemist in the laboratory because the plaintiff had made no progress in completing it. The other chemist, who had no experience in air pollution testing, completed the task in two and one-half days
 
 
 [10]
 The "sanitized" file is the EEOC file after the investigator's work product and any confidential statements have been removed. See 29 C.F.R. § 1610.18 (1980); EEOC Compliance Manual § 83.6. There is no indication in the record what specifically had been removed from this file. The plaintiff tries to make something of the fact that the complete file was not in evidence, but we are unpersuaded that this issue has any bearing on this case. As discussed infra, the admissibility of all opinion evidence was within the trial court's discretion and we do not find that he abused his discretion in any way
 
 
 [11]
 The following colloquy over the admissibility of this testimony occurred as follows:
 Q (Plaintiff's Counsel) And what did that investigation reveal?
 A (EEOC Investigator) As best as I can recall the investigation revealed that it was the policy of the Dade County Pollution Control to promote from within the Department, and I do recall reviewing several of the files of several people who were promoted, and each one was promoted from a lower grade into a higher position, supervisory position within that Department.
 MISS DEAN: Your Honor, if your Honor please, at this time I have had an opportunity to hear some of the testimony and I am going to move to strike.
 I believe under Title 72000 E-5 (sic ) this is a de novo hearing which is to take away from the judicial processes namely to hear the facts and make a determination. What Mr. Long is doing is using this investigatory complaint and I move that we ask to strike the testimony. We do have a file and it is admissible evidence and it is not binding, it is merely for your review.
 THE COURT: All right. Mr. Long?
 MR. LONG: Quite to the contrary, Judge. Well, not I don't disagree with everything that has been said in the objection. It is a de novo hearing and we will concur. The finding (sic ) of the Equal Employment Opportunity Commission are not in fact binding upon the Court.
 However, they are relevant in terms of investigation, relevant in terms of what was found and the basis for it and of probative value to the Court and in making a determination on the merits of the plaintiff's claim.
 ....
 MISS DEAN: Judge, that is the best argument of what that is. I don't object to the file. I object to this rehashing and supplanting your job here.
 THE COURT: I tend to agree with her in that respect if the file is here. Mr. Long, I see no real reason why we have to go through all of that. I will permit you a few more questions along those lines, and as it is, I would think that I am able to decipher in that file precisely what we are about and I have no reason to have to be embellished in what the Equal Employment Opportunity Commission does, and obviously you are here pursuant to the jurisdiction of the confines of this Court, so you can go forward for the factual determinations, and that is really what I am interested in.
 III R. 52-53, 55-56.
 
 
 [12]
 See note 11 supra. See also Smith v. Universal Servs., Inc., 454 F.2d 154, 157 (5th Cir. 1972); King v. Georgia Power Co., 295 F.Supp. 943, 947 (N.D.Ga.1968)
 
 
 [13]
 It is also, of course, within the discretion of the finder of fact to determine how much weight should be accorded the finding of the EEOC. See Hilton v. Wyman-Gordon Co., 624 F.2d 379, 383 (1st Cir. 1980). Cf. Alexander v. Gardner-Denver Co., 415 U.S. 36, 50 n.21, 94 S.Ct. 1011, 1020 n.21, 39 L.Ed.2d 147 (1974) (trial court has discretion to assign weight to arbitral decision on discrimination claim). The trial court's decision to accord the EEOC's finding little weight, II R. 379, was, we feel, amply justified in this case. The EEOC investigator admitted at trial that he never interviewed the person responsible for hiring Mr. Nystrom about plaintiff's complaint. See note 6 supra
 
 
 [14]
 Of course, a trial court may in its discretion find that such additional testimony is useful and allow it into evidence. See, e. g., Falcon v. General Tel. Co. of the S.W., 626 F.2d 369, 379 (5th Cir. 1980), remanded, 450 U.S. 1036, 101 S.Ct. 1752, 68 L.Ed.2d 234 (1981)
 
 
 [15]
 The plaintiff's arguments to the effect that the exclusion of this testimony precluded the effective development of plaintiff's case and that courts have expressed a preference for oral testimony are beside the point. The issue here is solely one of the trial court's discretion
 
 
 [16]
 In a Title VII disparate treatment suit, the plaintiff always retains the burden of proving discrimination by the employer. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Consequently, Dickerson cannot contend on appeal that there was insufficient evidence to support a finding of no retaliation because that characterization would essentially shift the burden of persuasion to the defendant to establish no retaliation. We therefore treat his appeal as one which urges that he established his allegations by a preponderance of the evidence and the trial court erred in not so holding
 
 
 [17]
 Section 704(a), 42 U.S.C. § 2000e-3(a), reads in pertinent part:
 It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
 
 
 [18]
 The plaintiff does not appeal the district court's finding that the plaintiff failed to prove a prima facie case of discrimination under Count I, which had alleged that DERM discriminated against him when it appointed Nystrom as Chief Chemist in 1972
 
 
 [19]
 Plaintiff's main contention appears to result from a misunderstanding at trial and over one of the findings of fact made by the trial court. The trial court found that, despite Dickerson's testimony to the contrary, he had not had back surgery prior to his discharge. Plaintiff takes exception to this finding and argues that his testimony about a back operation was ignored. He has demonstrated the fact of the operation, but it occurred in 1977 after his termination. While that proof demonstrates that his back condition was more serious than DERM believed, it in no way discredits the finding that DERM reasonably believed that Dickerson's absences were unjustified. As the issue of the injury's seriousness is irrelevant except as it pertains to the reasonableness of DERM's beliefs, this confusion does not alter the result of the case
 
 
 [20]
 Much of this evidence goes to the employer's burden of production to articulate a nondiscriminatory reason for discharging plaintiff, rather than to the question whether plaintiff established a prima facie case of retaliatory firing. Thus, even if we believed that plaintiff had established a prima facie case, which we do not, we would still feel constrained to hold for the defendant based on the evidence in the record. Because Dickerson introduced no evidence to suggest that the articulated reasons for firing were merely pretextual, the employer's proof would satisfy the McDonnell Douglas test