## Vital B. BOYCE

v.

## WESTERN ELECTRIC.

### No. CA 3–80–1013–C.

United States District Court,
N. D. Texas,
Dallas Division.

June 11, 1982.

Aglaia Mauzy and Donald J. Maison, Jr., Mauzy & Stenger, Dallas, Tex., for plaintiff.

Stephen F. Fink and Colleen B. Nabhan, Thompson & Knight, Dallas, Tex., for defendant.

OPINION

WILLIAM M. TAYLOR, Jr., District Judge.

The Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. is the basis for this Civil

Action. Plaintiff, a Black female, was terminated from her employment with Defendant on December 14, 1979, following an incident on December 12, 1979. Plaintiff then filed a charge with the Equal Employment Opportunity Commission on December 26, 1979. The Commission issued Plaintiff a Notice of Right to Sue on May 12, 1980, and Plaintiff filed this Civil Action on August 6, 1980. Plaintiff resides in this Division of this District and was employed here by Defendant. Clearly, this Court has jurisdiction.

Plaintiff was a lay-out operator for Defendant on the second shift at Defendant's Mesquite, Texas, works. As a lay-out operator, she was not a supervisor but was charged with insuring that the other employees in her section had the various items which they needed to perform their assigned tasks.

On the evening of December 12, 1979, Plaintiff and another employee of her section, Larry Cofer, a Black male, had a disagreement over ear plugs for Mr. Cofer to use. Plaintiff told him that she had already given him all the ear plugs that she had and that if he wanted more, he would have to get them from their supervisor, Section Chief Jim Thompson.

Shortly thereafter, Mr. Cofer returned to the section work area and renewed the argument. He then, apparently, stuck his finger in Plaintiff's face. Plaintiff responded by either pushing the hand away or slapping it. Different witnesses had different versions of this sequence of events. Mr. Cofer then stuck his finger in Plaintiff's face again with the same result. After this, it is not clear if it were immediately or a short time later, but in the same incident, Plaintiff attempted to arise from the chair in which she was seated. Mr. Cofer then pushed Plaintiff back into her chair. From here, the exact sequence of events is even more cloudy. But, in any event, the two were soon on the floor struggling with Plaintiff on bottom. One version is that when Mr. Cofer pushed Plaintiff back into the chair, she grabbed him and the match was on.

Other employees of the section quickly disengaged the combatants. When they were separated, Plaintiff took a swing at Mr. Cofer.

Plaintiff immediately after the incident went to Mr. Thompson, a Caucasian, and reported the incident to him. In the midst of this conversation Mr. Cofer came up and started to argue with Plaintiff again. Mr. Thompson quieted them down and took them to a conference room where both told their stories to him. Mr. Cofer's version of the facts as related to Mr. Thompson did not materially differ from Plaintiff's.

Mr. Thompson then suspended both employees pending investigation of the incident and had them separately escorted from the plant. Both of these were standard procedures at the Mesquite works of Defendant.

Mr. Thompson and another first level supervisor then took written statements of all of the employees who had seen the altercation.

The following morning, Mr. Thompson notified his supervisor of the incident who, in turn, notified his supervisor.

Later that day, the two first level supervisors, the second level supervisor and the third level supervisor met. Exactly who recommended that both Plaintiff and Mr. Cofer be terminated is not clear. But from the testimony of those involved in the meeting, apparently a consensus was reached that both employees be fired.

The Mesquite Works' Rules of Employee Conduct that were in effect in December, 1979, make it clear that fighting may be disciplined by termination. The third level supervisor, Assistant Manager Ross McConnell, who had the authority to terminate, testified that he believed that Plaintiff should be terminated because:

(1) the disagreement had precipitated over a period of time,

(2) both employees had taken physical action against the other,

(3) the physical altercation would not have happened if either employee had walked away before there was physi-

cal contact or by Plaintiff having one of the other employees nearby summon the supervisor, and

(4) the altercation had to be broken up by other employees.

Mr. McConnell consulted with Jack McCafferty, the Human Resources and Labor Relations Manager at the Mesquite Works before making a final decision. Mr. McCafferty concurred that termination of Plaintiff and Mr. Cofer would be appropriate discipline in light of the Works' Rules, the applicable collective bargaining agreement, and the various potentially applicable laws.

So the following day, December 14, 1979, both were notified that they were terminated.

Each of the managers who had input into the terminations was a male Caucasian.

Plaintiff, parallel to her charge with the E.E.O.C., pursued a grievance which was denied by Defendant at four levels and dropped by the representing Union at the fifth level.

As is usually the case, Plaintiff has presented no direct evidence that Defendant or any of its supervisors intended to discriminate against her. The evidence that Plaintiff presented was then circumstantial in nature. She has attempted to show that she was discriminated against in that she was treated disparately from Caucasian employees in that Caucasian employees are not terminated for same or similar conduct.[1]

The burdens of persuasion and production in a discrimination case have been specified by the Supreme Court in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), to be

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. (citations omitted)

Of course, the burden of persuasion never shifts to the Defendant, only the burden of production shifts[2] in disparate treatment cases. *Marks v. Prattco, Inc.*, 607 F.2d 1153 (5th Cir. 1979), sets out at p. 1155 the elements of a prima facie case in a discharge suit. They are:

(1) They are members of a protected minority;

(2) They were qualified for the jobs from which they were discharged;

(3) They were discharged; and

(4) After they were discharged their employer filled the positions with nonminorities.

The recent case of *Coleman v. Braniff Airways, Inc.*, 664 F.2d 1282 (5th Cir. 1982), recognized that these elements do not address a situation such as was before that court then and this one now. But the Fifth Circuit did recognize that an allegation that a minority employee had been dismissed where other nonminority employees had not been treated so harshly does state a cause of action. It appears that in reality the Fifth Circuit in *Coleman v. Braniff* was redefining the prima facie test in termina-

---

1. The Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1970), held that the Civil Rights laws reached practices of employers that had the effect of discriminating against minorities though the employers did not intend to discriminate against their minority employees.

2. Two Courts of Appeal have recently held this to be so, in another context. See *Behring International, Inc. v. N.L.R.B.*, 675 F.2d 83 (3rd Cir., 1982) and *N.L.R.B. v. Transportation Management Corp.*, 674 F.2d 130 (1st Cir., 1982). In disparate impact cases the burden of persuasion does shift to the defendant. See *Johnson v. Uncle Ben's, Inc.*, 657 F.2d 750 (5th Cir. 1981).

tion cases in the light of *Burdine*.[3] To say that a cause of action has been stated is to say that the elements of a prima facie case have been stated.

In *Marks v. Prattco, Inc.*, a new head housekeeper had been hired at a Holiday Inn. The first thing that she did was to fire five black housekeepers. This left four housekeepers, all of whom were white. Before five days were up, the two plaintiffs in *Marks* had been replaced with whites.

It would appear that those plaintiffs had made a prima facie showing of discrimination when they showed that all of the black housekeepers were fired and all of the white housekeepers were retained. That they were replaced by either minority or nonminority employees would seem to be evidence tending to show either an illegal motive on the part of an employer or to rebut an allegation of illegal motive.

So in the present case, Plaintiff's initial burden at trial was to show

(1) she is a member of a minority,

(2) she was qualified for her job,

(3) she was discharged, and

(4) nonminorities in same or similar situations were not disciplined the same or similarly.

It must be remembered that these Title VII cases are tried to the Court. That at the close of a plaintiff's case in chief, the judge presiding may conclude that the plaintiff has not had a massive failure of proof but that if the defendant were to

present no evidence, it would take the same careful thought in order to decide if the plaintiff had proven his or her case. So given that most of these trials are rather short, the Judge is very likely to deny a motion to dismiss under Rule 41(b), F.R. C.P.[4] in this sort of situation. In essence, the Judge may have doubts about the plaintiff's case, but will go ahead and hear the rest of the evidence while the parties and witnesses are gathered together.

Therefore, as a matter of practicality, the burdens of the parties at trial may become a bit blurred in order to insure that justice is done.

So after each party has presented all the evidence that it wishes to present and has been allowed, there is one remaining burden in these cases, plaintiff's burden of proof.

■ In this Civil Action, Plaintiff has not carried her burden. In hindsight, her termination by Defendant may not have been totally fair. But that is not the question to be answered. The question is whether or not Plaintiff was treated differently from the way Defendant treats other, non-black, employees because she is a black.

Plaintiff's proof as to the treatment of others in similar situations was intended to show that Caucasians who committed violent acts were not terminated.

As a part of this proof Plaintiff has attempted to show that the distinction that Defendant has made between "fighting"

---

**3.** See *Knight v. City of Bogalusa*, 673 F.2d 759 (5th Cir., 1982) for a case that was remanded in the light of *Burdine*. But also see *Avery v. Homewood City Board of Education*, 674 F.2d 337 (Former 5th Cir., April 26, 1982) where *Burdine* was not discussed in a *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) situation.

**4.** Rule 41(b) reads:
Involuntary Dismissal: Effect Thereof. For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against him. After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a). Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication upon the merits.

and "horseplay" is invalid. The dictionary defines horseplay as "... rough, boisterous fun." [5] The same dictionary defines fight as "... 1, a physical struggle; battle; combat ..." [6] It is apparent that there is a distinction between these two terms and that difference is the intent to injure or conquer that is lacking in horseplay.

Plaintiff introduced a few of Defendant's disciplinary action files and Defendant introduced 30 of them [7] including duplicates of those introduced by Plaintiff.

A careful review of those files does reveal that Defendant disciplines employees deemed to have engaged in horseplay less harshly than Plaintiff was disciplined even though the horseplay in some instances did result in physical injuries. But the files did also reveal that these instances of horseplay were horseplay and not fights.

Plaintiff has made much of two other incidents. The first involving a Caucasian male who threw a set of Allen wrenches in a pique of anger. The second involving two Caucasian women who undoubtedly got into a fight.

The file concerning the Caucasian male shows that he had ducked under something and stood up too soon, bumping his head. A female employee laughed at him and he threw the wrench set at her. It hit her leg and he said, "There. See if that is funny." The female had to go to the plant's medical facility to have the flow of blood from her leg stanched.

Although deeming the incident serious, the first level supervisor recommended a one-day suspension. The male employee was not contentious, he stated that he was having marital problems resulting in considerable strain and said that he was sorry. In this incident, the supervisor did take note of the employee's work record and, in essence, vouched for him saying that "the incident (was) totally out of character."

As a result of the other incident, the two Caucasian females were originally terminated. The union grieved and they were reinstated at the fifth level of the grievance procedure. The altercation arose out of the two participants' disagreement over union matters.

Defendant's witness McCafferty's un-rebutted testimony at trial was that the grievances filed on behalf of the two female Caucasians were settled by him and a union representative for reasons not relating to the merits of the terminations.

These two incidents are slender reeds on which to support allegations of disparate treatment.

This is true, in particular, when three other incidents involving Caucasian employees are considered.

As a result of the first incident both a Caucasian male and a black male were terminated. From the written statements of other employees who witnessed the altercation, it appears that both employees did their part to provoke a fight, then they both joined in and continued to fight after being ordered to desist by their supervisor and after attempts were made by fellow employees to separate them. The incident came to a close only after security personnel intervened.

In the second incident, a supervisor sat down two employees and warned them not to engage in horseplay. Shortly thereafter, one of the employees, a Caucasian male, accosted the supervisor, raised his fist and threatened the supervisor. The next day, he was terminated.

The third incident was similar in that another Caucasian male was terminated for "(a) conduct unbecoming an employee (b) threatening a Western Electric supervisor (c) unsatisfactory attendance...." [8]

---

5. Webster's New World Dictionary 678. (2nd College Ed.1970).

6. Id. at 520.

7. Defendant's witness McCafferty testified that these were all of the files which he could find in

Defendant's records involving incidents that could be described as physical altercations or horseplay.

8. Defendant's Exhibit 8(v).

Overall, Plaintiff has not shown any pattern of disparate treatment. Some Caucasian employees have been treated more harshly, some less so harshly. Some minority employees have been treated more harshly, some less so.

The bottom line, though, is that some Caucasian employees of the Mesquite works have been terminated by Defendant for comparable conduct. That it might be said that Plaintiff possibly should have been disciplined short of termination is without moment in this proceeding. The only question before this Court is whether or not Plaintiff was treated differently from similarly situated non-black employees when she was terminated.

Defendant's supervisors may not have meted out discipline with absolute consistency. But Plaintiff has not shown such inconsistency from which it can be inferred that she was disparately treated because of her race, black.